# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK                    NYSCEF E-File Case
COUNTY OF NEW YORK
------------------------------------------------------------------------x
   SRINIVAS PARUCHURI                                     Index No.

<em>Plaintiff,</em>

              _____/2022

-against-

<strong><u>SUMMONS</u></strong>

RE.IMAGIN, INC.; JENNIFER SNAPE; and "JOHN
DOE" and "JANE DOE," numbers 1 through 10,
fictitiously named parties or entities, true names
unknown, the parties intended being the managers,
operators, or successors of the business being carried on
by defendants RE.IMAGIN, INC.; JENNIFER SNAPE,

<em>Defendants.</em>

------------------------------------------------------------------------x
TO THE ABOVE-NAMED DEFENDANTS:

     YOU ARE HEREBY SUMMONED TO ANSWER the Verified Complaint in this action

and to serve a copy of your Answer on Plaintiff, Srinivas Paruchuri, within twenty (20) days

after the service of this Summons, exclusive of the day of service, or within thirty (30) days after

service is complete if this Summons is not personally delivered to you within the State of New

York. In case of your failure to appear or Answer, judgment will be taken against you by default

for the relief demanded in the Complaint.

     The basis of the venue designated is the residence of Defendant Jennifer Snape, principal

place of business of Defendant Re.Imagin Inc., and the county in which the causes of action set

forth in the Verified Complaint arose. Plaintiff designates New York County as the place of trial.

Dated:      New York, New York
              October 25, 2022

Case 1:22-cv-10998-VEC    Document 1-1    Filed 12/30/22    Page 3 of 86

MOSS & MOSS LLP


By: _____

BRANDON MCKENZIE
Moss & Moss LLP
381 Park Avenue South
Suite 1220
New York, New York 10016
Tel.: 212 644-1000
Email: bmckenzie@mossandmoss.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

NYSCEF E-File Case

-------------------------------------------------------------------------x

SRINIVAS PARUCHURI

Index No.

Plaintiff,

_____/2022

-against-

**VERIFIED
COMPLAINT**

RE.IMAGIN, INC.; JENNIFER SNAPE; and "JOHN
DOE" and "JANE DOE," numbers 1 through 10,
fictitiously named parties or entities, true names
unknown, the parties intended being the managers,
operators, or successors of the business being carried on
by defendants RE.IMAGIN, INC.; JENNIFER SNAPE,

*Defendants*.

-------------------------------------------------------------------------x

Plaintiff, SRINIVAS PARUCHURI, by his attorney, BRANDON A. MCKENZIE, Of

Counsel to Moss & Moss LLP, for his Complaint against Defendants, alleges as follows, upon

information and belief:

## NATURE OF THE ACTION

1. Plaintiff, Srinivas Paruchuri ("Vas", "Plaintiff") brings this action for breach of contract,

fraudulent inducement, conversion, breach of fiduciary duty, quantum meruit, and unjust

enrichment to recover damages sustained based on Defendants' conduct.

2. Vas is a talented computer engineer who was brought on by Jennifer Snape ("Snape"),

Founder and Chief Executive Officer ("CEO") of Re.imagin, Inc. ("Company"), to be Co-Founder

and Chief Technology Officer ("CTO") of the Company in April of 2022. Per the terms of Snape

and Vas' agreement ("Agreement"), Vas was to produce a set of demonstration screens of Snape's

idea for a product designed for Private Equity firms that Snape could in turn show to venture

capitalists in the United States and Europe to raise money for the Company. Additionally, as a part

of the Agreement, Vas was to build a prototype of a product ("Product" or "Technology") for the

Company within six (6) months. Snape promised Vas that, in exchange for the aforementioned services, Vas would receive an ownership stake of thirty-five percent (35%) equity in the Company, a seat on the Company's board, and an annual salary of $150,000.00, with payment of the salary deferred until the first quarter of 2023. Snape represented to Vas that Salary payments were to be deferred because Snape needed to close a pre-seed round of financing for the Company, which she represented would be completed by August 31, 2022, for up to $1,000,000.00, at a $12,000,000.00 valuation cap. In fact, in June of 2022, Snape was actively representing to prospective investors that $500,000.00 has been committed out of the $1,000,000.00 total sought to be raised. Based on Snape's representations, both on behalf of herself and the Company, Vas forewent other paid opportunities and expended his own resources, both time and money, to build and advance the Company's Technology. In fact, Vas worked consistent seven (7) day work weeks for several months, including late nights and early mornings, to develop the Company's code base, even working European hours to accommodate Snape's schedule while Snape was in London and Italy with her fiancé for approximately one month. Snape frequently praised Vas' work product and provided warm and positive feedback. Given the demanding nature of the work and the anticipated demands of prospective clients of the Product, Vas brought on an additional engineer, Li Jie Ye ("Leaf Ye"), based out of Elmhurst, Queens. Because Leaf Ye and Vas knew one another before Vas commenced work with the Company, Leaf Ye agreed to work at a substantially reduced rate of $40.00 per hour. The Company paid $25.00 per hour of Leaf Ye's fees, and Vas paid the difference out of his own pocket. Despite Snape having represented at times that the pre-seed financing round had $500,000.00 commitments out of a $1,000,000.00 raise target, in late August, Snape began inexplicably altering Company documents, including changing parts of Vas' progress reports to indicate that previously completed work was not done. Snape failed to close the round

by August 31, 2022. On September 1, 2022, Snape called a meeting, which Snape called a board meeting, that was attended by Snape, Vas, Snape's father Allan Snape, and Snape's friend Peter Ngunyi. Despite Vas' board seat, Snape had not previously disclosed that her father and her friend were members of the Company's board, and, to date, Vas has seen no documentation indicating that the two are, or ever were, members of the Company's board or board observers. At the September 1, 2022 meeting, in a complete reversal from her prior praise, Snape assailed Vas' work. Snape's father and friend voiced their support for Snape's aspersions, after which Snape casually announced that she would be moving the close date of the pre-seed financing round to least December of 2022 or January of 2023. After the September meeting, Snape continued surreptitiously modifying company documents, materials, and data, often to restrict or reduce Vas' use or access. Snape also began sending emails to Vas in an apparent attempt to fabricate context for terminating their relationship. On September 9, 2022, Snape sent Vas an email suggesting that Snape considered subcontracting work to an external team to support Vas in building the Product and suggesting a substantial modification to the terms of the original Agreement. Under Snape's new proposed terms, Vas' title would change from CTO to "Senior Developer," Vas' compensation would drop from $150,000.00 per annum to $5,000.00 per month, and his equity ownership in the Company would drop from 35% to 4%. Vas did not accept Snape's proposed modification of the Agreement, and, despite no deadline having been expressed for acceptance or rejection of the proposed modification, Snape pronounced the offer to have expired and requested that Vas turn over all "company documents, credentials and assets." On September 16, 2022, Vas emailed Snape to object to her apparent "paper trail of falsehoods" sent via email, to advise her that her new proposal was "not in line with the terms of [their] agreement," to advise that he remained "ready, willing, and able to fulfill [his] role as CTO/cofounder" despite Snape preventing

him from accessing Company materials, and to offer to engage in conversations around amicable dissolution of the working relationship. Snape did not respond to that email and locked Vas out of various company accounts, including his own company email address. As of October 6, 2022, the Company's domain, Reimag.in, was offline. As of October 25, 2022, the domain was back online. As a result of Defendants' conduct, Vas has been damaged in an amount to be proven at trial, but, at a minimum, $4,357,235.70.

## PARTIES

1.    Plaintiff SRINIVAS PARUCHURI ("Vas") is a natural person who presently resides at 25 Forest Street, Apartment 7J, Stamford, Connecticut 06901.

2.    Defendant JENNIFER SNAPE ("Snape") is a natural person who resides at 215 West 79th Street, Apartment 4A, New York, New York 10024-6242.

3.    Defendant RE.IMAGIN INC. is an unauthorized foreign business corporation, with a Delaware address of 1209 Orange Street, Wilmington, Delaware 19801, that has been openly operating in New York and maintaining a principal place of business at 215 West 79th Street, Apartment 4A, New York, New York 10024-6242.

## VENUE AND JURISDICTION

4.    This Court has jurisdiction over this matter because New York County, New York State is where Defendant Snape resides, where Defendant Re.imagin, Inc. has its principal place of business, despite not being authorized to conduct business in the State of New York, and where the causes of action set forth herein arose.

## STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION

5.    On February 2, 2022 RE.IMAGIN, INC. was formed in Delaware (**EXHIBIT 1**).

6.     In April of 2022, Vas was introduced to Snape by Devin Bostick during Snape's search for a technical co-founder for the Company.

7.     On April 8, 2022, Snape made an offer by phone to Vas to become the Company's Co-Founder and CTO.

8.     The principal terms of Snape's offer to Vas were as follows:

   a.   Vas would become co-founder and CTO of RE.IMAGIN INC effective upon agreement;

   b.   Vas would produce a set of demonstration screens of the Company's product for Snape to show to prospective investors;

   c.   Vas would create a prototype of the product for the Company within six (6) months;

   d.   Vas would receive a thirty-five percent (35%) equity ownership interest in the Company upon agreement;

   e.   Vas would receive a seat on the Company's board upon agreement.

   f.   Snape would fundraise on behalf of the company to raise a pre-seed financing round of $1,000,000.00 on or before August 31, 2022;

   g.   Vas would receive a salary of $150,000.00, but payment of the salary would start in the first quarter of 2023 with a 4% inflation increase, bringing Vas' salary to $156,000.00 per annum starting in 2023 (*See,* **EXHIBIT 2** – Company financial model).

   h.   Vas would execute a confidentiality and intellectual property assignment deed (the "IP Deed" – **EXHIBIT 3**), drafted by and prepared by the Company.

9.      On April 9, 2022, Vas accepted Snape's offer and commenced in his role at CTO pursuant to their agreement (the "Agreement").

10.     On or about April 11, 2022, Snape sent Vas the Deed, dated April 11, 2022.

11.     The Deed itself sets forth no consideration from the Company.

12.     The Deed, according to page 7 thereof, is governed "in accordance with section 127 of the Corporations Act 2001 (Cth)," an Australian law.

13.     The deed was signed by Snape on behalf of the Company.

14.     The "witness" signature block for the witness to Vas' signature as Assignor was also executed by Snape prior to execution by Vas (*See*, **EXHIBIT 4**, the Deed signed by Snape twice before Vas executed the Deed).

15.     In reliance on Snape's representations, individually and on behalf of the Company, Vas signed the Deed.

16.     Vas fully performed under the Agreement.

17.     Vas created demonstration screens.

18.     Vas created a prototype, as well as additional work product, for the Company.

19.     Vas forewent other opportunities to take the role of CTO and Co-Founder at the Company.[1]

20.     Vas forewent an opportunity to become an Adjunct Professor role at UCLA's math department, a role he was offered by the head of the department, but turned the role down upon Snape's recommendation.

---

[1] Vas was offered the role of co-founder at Reserv (*See,* https://www.reserv.com/, and https://www.linkedin.com/company/reserv-ai/), which had already close a seed round of $8,000,000.00 dollars from Bain Capital (https://www.finsmes.com/2022/07/reserv-raises-8m-in-seed-funding.html) at the time the offer was made by the CEO, CJ Przybyl (https://www.linkedin.com/in/cj-przybyl-9061383/). That role would have secured Vas substantial compensation and equity in a well-funded early stage startup.

21.     Vas consistently received warm and positive feedback on his work product from Snape prior to the August 31, 2022 close date for the financing round.

22.     Snape, as Chief Executive Officer of the Company, represented to Vas that she would dedicate her professional efforts to raising a pre-seed financing round of $1,000,000.00 for the Company by August 31, 2022 at a $12,000,000.00 valuation cap.

23.     By June of 2022, Snape was representing to prospective investors that she already had $500,000.00 committed of the $1,000,000.00 round (*See, e.g.* **EXHIBIT 5**).

24.     In June, the investor deck that Snape created and used for fundraising listed Vas as CTO (**EXHIBIT 6** at p. 9).

25.     Snape signed emails to potential investors on behalf of herself and Vas.

26.     Thirty-five percent (35%) of $12,000,000.00 is $4,200,000.00.

27.     On July 27, 2022, Snape emailed with counsel for Company, Austin Harms at Perkins Coie LLP to, among other matters, properly document the Co-Founders' ownership interests in the Company, with Vas at thirty-five percent (35%) and Snape at sixty-five percent (65%) (**EXHIBIT 7**).

28.     In that same July 27, 2022 email, Snape confirmed that Vas was "to have a Board seat."

29.     For the duration of the period during which Vas was to build, and was building, the Company's prototype, Vas dedicated tremendous professional efforts toward same, consistently working seven (7) day work weeks, including late nights and early mornings.

30.     During the month of August, which Snape had represented was the month in which the pre-seed round was to close, Snape and her fiancé were in Italy.

31.     Vas worked additional odd hours to accommodate the time zone difference between he and Snape while she was in Europe.

32.     On many occasions, Snape missed calls or did not return calls with Vas, despite Vas making efforts to wake up extra early to connect with Snape.

33.     Vas' eighty-two-year-old father pulled Vas aside in August to plead with Vas to stop working so much.

34.     Given the demanding nature and amount of work, as well as the anticipated demands of prospective clients of the Product, Vas brought on an additional engineer, Li Jie Ye ("Leaf Ye"), based out of Elmhurst, Queens.

35.     Because Leaf Ye and Vas knew one another before Vas commenced work with the Company, Leaf Ye agreed to work at a substantially reduced rate of $45.00 per hour.

36.     The Company paid $25.00 per hour of Leaf Ye's fees, and Vas paid the difference out of his own pocket, which ultimately totaled $1,200.00, plus payment processing fees, bringing the total to $1,235.70 (**EXHIBIT 8**).

37.     On August 15 and 22, respectively, of 2022, Snape marked Vas' deliverables under the Agreement "DONE" in a tracking sheet in Google Sheets (**EXHIBIT 9**, **EXHIBIT 10**).

38.     As the end of August approached, the fundraising round had not been closed.

39.     On August 28, 2022, Snape, without consulting Vas, went back into the Google Sheet and removed copy that indicated that deliverables were "DONE" (**EXHIBIT 11**).

40.     In late August, Vas asked Snape multiple times about the status of fundraising.

41.     Snape refused to disclose specifics regarding fundraising to Vas.

42.     Snape failed to close the pre-seed financing round by August 31, 2022.

43.     Snape called a meeting, which she referred to as a "Board Meeting" for the Company for September 1, 2022.

44.      In attendance at the meeting were Snape, Vas, Snape's father Allan Snape, and Snape's friend Peter Ngunyi.

45.     At no point prior to that meeting did Snape ever disclose to Vas that Allan Snape or Peter Ngunyi were members of the Company's board or holders of board observer status.

46.     To date, Snape has not furnished Vas with any documentation indicating that Allan Snape or Peter Ngunyi are, or ever were, members of the Company's board or board observers allowed to attend meetings.

47.     For that meeting, however, Snape prepared a "Workplan" slide deck (**EXHIBIT 12**), with the above-referenced attendees listed (p.1), listing Peter Ngunyi as an "Advisor" (p. 9), and listing Vas as "CTO (p. 8).

48.     Those slides also showed a $6,000.00 per month salary line item for Vas (p. 6) for the remainder of 2022, which Snape and Vas has agreed upon as being an appropriate interim measure, leading up to payment of Vas' full salary, as agreed, at the start of 2023.

49.     Those slides also showed on the "Milestones" page (p. 4) "Vas to manage build" under the "Products" section.

50.     At that meeting, Snape, in a stark reversal from her prior praise for Vas' work, criticized Vas' work.

51.     Snape's father and friend voiced their support for Snape at that meeting.

52.     Thereafter, at that same meeting, Snape casually announced that she would be moving the close of the financing round to January of 2023.

53.     Following the September 1 meeting, after Snape's month away in Italy and London, Snape asked Vas to meet her for dinner on September 8, 2022, which Vas did (**EXHIBIT 13**).

54.     At that dinner, Snape told Vas that she wanted to move Vas to a different role but did not provide details regarding the scope of work, compensation details, or detailed nature of the role, except that Snape indicated that the role would not be one of a C-level executive.

55.     Vas asked Snape to present a formal offer for him to evaluate if there was to be a change to their Agreement.

56.     On September 9, 2022, Snape sent Vas an email outlining the basic parameters of her offer (**EXHIBIT 14**), noting that she had "identified a team" to support Vas, and further noting that such team would (a modal auxiliary verb indicating possibility, not certainty) be subcontracted to leave open the possibility of retaining or not retaining their services for more than three (3) months.

57.     That offer would change Vas' title to "Senior Developer," change his compensation to $5,000.00 per month, and change his equity ownership interest in the Company to four percent (4%).

58.     On September 11, 2022, Vas replied via email advising that he would get back to her with a "careful and thoughtful response" by the end of the week, September 16, 2022 (**EXHIBIT 15**).

59.     On September 11, 2022, without warning, Snape revoked Vas access to the Company's website domain on GoDaddy (**EXHIBIT 16**).

60.     A few minutes later, on September 11, 2022, Snape requested that Vas give her a response by end of day on Tuesday, September 13, 2022 and advised that she plan on taking "kick off" calls without Vas on September 12 and 13 (**EXHIBIT 17**).

61.     On September 13, 2022, Vas asked Snape via email if Snape could explain current expectations for the new role, including responsibilities and deliverables, as well feedback on prior documentation (**EXHIBIT 18**).

62.     On September 13, 2022, Snape replied via email, noting that she believed Vas to be "an incredible asset" and providing some specifics regarding the proposed role (**EXHIBIT 19**).

63.     On September 14, 2022, Snape sent Vas an email stating "[A]s you know, we kicked off with the contracted new development team today." (**EXHIBIT 20**).

64.     Vas was unaware that a new team had been contracted; only a few days prior, Snape had indicated that she had "identified" but not hired or otherwise contracted with any team.

65.     In Snape's September 14, 2022 email, she criticized certain technical aspects, apparently attributable to Vas, stating that "the team will re-start the entirety of the build process."

66.     Snape went on to state that "the period of time for the new offer has expired and as agreed in our documentation, we kindly ask for you to hand over all company documents, credentials and assets within 48 hours."

67.     Vas replied on September 14, 2022 to stated that while Snape had expressed a "hope" for a quick response, no deadline was ever specified; Vas went on to ask where Snape's

alleged 48 hour period was codified and what credentials she sought from him, as Snape was on all of the accounts. (**EXHIBIT 21**).

68.    Snape replied with the copy from her September 11, 2022 email, "if you could let me know by Tuesday EOD, that would be great." (**EXHIBIT 22**).

69.    On September 16, 2022, Vas replied via email to Snape advising her of the following:

a.    That per the terms of their Agreement, Vas was CTO and co-founder of the Company, a holder of a thirty-five percent (35%) equity ownership interest therein, a board member, and entitled to an annual salary of $150,000.00;

b.    That Snape's suggestions or claims of unresponsiveness by Vas were incorrect, as Snape had either failed to invite Vas to certain meetings or simply cancelled them (**EXHIBIT 23**);

c.    That Vas did not respond to someone named "Peter" because said person did "not have any official role at the company.";

d.    That Vas was unaware of the start of the new tech team;

e.    That Vas had responded to Snape in a timely fashion; and

f.    That Vas stood ready, willing, and able to fulfill his role as CTO and co-founder but was open to a conversation regarding amicable dissolution of their working relationship.

70.    Vas received no reply to that September 16, 2022 email.

71.    As of the date of this filing, Snape's LinkedIn profile continues to show her current title as "Founder" at "Stealth" from "2022 – Present" and a current location of New York, New York (**EXHIBIT 24**).

72. "Stealth" is also reflected on Vas' LinkedIn as his current company (**EXHIBIT 25**), a change Snape required Vas to make.

73. "Stealth" is a company name often used by start-ups to indicate that the company's name or business has yet to be announced to the general public.

## AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

74. Plaintiff repeats and re-alleges each and every allegation set forth hereinabove inclusive, with the full force and effect as if set forth at length herein.

75. Pursuant to the Agreement, Vas is the Co-Founder, CTO, and board member of the Company.

76. Vas fully performed under the Agreement.

77. Vas stands ready, willing, and able to continue performing under the Agreement.

78. Snape failed to perform her obligations under the Agreement.

79. Snape failed to raise a pre-seed financing round of up to $1,000,000.00 on or before August 31, 2022.

80. Neither Snape nor the Company issued the agreed-upon thirty-five percent (35%) equity ownership interest in the Company to Vas.

81. Snape actively locked Vas out of, or terminated or suspended, company accounts Vas used to fulfill his obligations under the Agreement.

82. Neither Snape nor the Company have paid Vas in salary or otherwise for any of the work Vas has produced to date.

83. As a result of Defendants' breaches of the Agreement, Vas has suffered damages and continues to suffer damages, including, without limitation, lost earnings, lost opportunities, loss

of value, loss of property, and reputational harm in an amount to be determined at trial, but a minimum of $4,357,235.70.

**AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION**
**FRAUDULENT INDUCEMENT**

84. Plaintiff repeats and re-alleges each and every allegation set forth hereinabove inclusive, with the full force and effect as if set forth at length herein.

85. In April of 2022, Snape represented to Vas that Snape would raise $1,000,000.00 on or before August 31, 2022 for the Company.

86. That representation was false, and Snape knew that representation to be false.

87. In April of 2022, Snape represented to Vas that Vas would receive a thirty-five percent (35%) equity ownership interest in the Company.

88. That representation was false, and Snape knew it to be false.

89. In April of 2022, Snape represented to Vas that Vas would receive a salary for his role as CTO of $150,000.00, to be paid commencing at the start of 2023, post-raise.

90. That representation was false, and Snape knew it to be false.

91. Snape made the above representations to induce Vas to rely on those representations, so that Vas would dedicate his professional efforts to the Company and build the Product for the Company.

92. Vas actually relied on Snape's representations.

93. Vas did not know that Snape's representations were false.

94. Vas built the Product for the Company and devoted substantial time and efforts to working for, and on behalf of, the Company, based on Snape's representations.

95. Vas executed the Deed based on Snape's false representations.

96. Vas relied on those representations and built the Product for the Company

97. As a result of Snape's fraudulent inducement, Vas has suffered damages and continues to suffer damages, including, without limitation, lost earnings, lost opportunities, loss of value, loss of property, and reputational harm in an amount to be determined at trial, but a minimum of $4,357,235.70.

### AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION
### CONVERSION

98. Plaintiff repeats and re-alleges each and every allegation set forth hereinabove inclusive, with the full force and effect as if set forth at length herein.

99. Vas has a thirty-five percent (35%) equity interest in the Company.

100.    Snape failed to fulfill her obligations under the Agreement, individually and on behalf of the Company.

101.    The Deed is invalid.

102.    Vas owns or has a present right to possess his own work product and intellectual property he created.

103.    Snape has exercised dominion and control over certain intellectual property belonging to Vas.

104.    Snape has intentionally interfered with Vas' intellectual property and rights thereto and therein.

105.    On information and belief, Snape has altered, modified, or transferred certain intellectual property belonging to Vas out of the Company.

106.    Snape has deprived Vas of possession or use of the intellectual property in question.

107.    Snape's interference and deprivation have caused Vas to suffer damages and to

continues to suffer damages, including, without limitation loss of value, loss of property, and

reputational harm in an amount to be determined at trial, but a minimum of $4,200,000.00.

### AS AND FOR PLAINTIFF'S FOURTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY

108.    Plaintiff repeats and re-alleges each and every allegation set forth hereinabove

inclusive, with the full force and effect as if set forth at length herein.

109.    Snape is a director of the Company and, as such, has fiduciary duties to the

Company and to its shareholders.

110.    Vas is a shareholder of the Company.

111.    Snape unilaterally and improperly forced Vas out of the Company and prevented

him from accessing Company materials and property belonging to Vas.

112.    Snape, accordingly, has exposed the Company to legal liability and potential

related expense.

113.    Snape unilaterally diverted Company property to herself and unnamed persons

and/or entities outside of the Company.

114.    As a shareholder, Vas has suffered, and continues to suffer, damages including,

without limitation loss of value, loss of property, and reputational harm in an amount to be

determined at trial, but a minimum of $4,200,000.00.

### AS AND FOR PLAINTIFF'S FIFTH CAUSE OF ACTION
### QUANTUM MERUIT – ALTERNATIVE PLED TO FIRST CAUSE OF ACTION

115.    Plaintiff repeats and re-alleges each and every allegation set forth hereinabove

inclusive, with the full force and effect as if set forth at length herein.

Case 1:22-cv-10998-VEC    Document 1-1    Filed 12/30/22    Page 20 of 86

116.     From April of 2022 through September of 2022 when Snape terminated Vas'

access to certain Company resources, including Vas' Company email address, Vas performed

development services for Snape and the Company and produced considerable work Product in

good faith for, and on behalf of, Snape and the Company.

117.     Snape and the Company accepted scuh work product, enjoyed the benefits of Vas'

work product and, to date, retain Vas' work product.

118.     On information and belief, Snape and the Company are presently using, adapting,

modifying, or otherwise building on Vas' work product.

119.     Snape and the Company requested that Vas produce his work product and turn

over same to, and for the benefit of, Snape and the Company.

120.     Snape and the Company accepted Vas' work product voluntarily and without

coercion.

121.     Snape and the Company have retained Vas' work product.

122.     Vas expected to be compensated with a thirty-five percent (35%) equity

ownership interest in the Company.

123.     Vas executed a Deed to assign his work product and which was to be the owner of

that work product, such that Vas would, in essence, continue to own a thirty-five percent (35%)

interest in his work product.

124.     In addition to a thirty-five percent (35%) equity grant, Vas expected to be

compensated at a rate of at least $150,000.00 per annum, as was promised by Snape.

125.     Vas dedicated many, many hours, including late nights, early mornings, and

weekends to producing the work product.

126.     The reasonable value for comparable work and hours expended by a similarly-skilled developer in the United States would far exceed the $150,000.00 per annum base salary promised to Vas before consideration of the value of the thirty-five percent (35%) equity grant.

127.     Snape and the Company have failed to compensate Vas in any way for Vas' work.

128.     In light of the foregoing, Vas has suffered, and continues to suffer, damages including, without limitation loss of value, loss of earnings, and reputational harm in an amount to be determined at trial, but a minimum of $150,000.00.

**AS AND FOR PLAINTIFF'S SIXTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

129.     Plaintiff repeats and re-alleges each and every allegation set forth hereinabove inclusive, with the full force and effect as if set forth at length herein.

130.     Snape, the Company, and successor entities and/or individuals of the business of the Company, true names presently unknown, have been enriched by Vas' work product and efforts for and on behalf of the Company to date.

131.     Such enrichment came at great personal expense to Vas, personally, temporally, and financially.

132.     To permit Snape, the Company, and such unnamed parties to retain the fruits of Vas' labor would be against equity and good conscience.

133.     In light of the foregoing, Vas has suffered, and continues to suffer, damages including, without limitation loss of value, loss of earnings, and reputational harm in an amount to be determined at trial, but a minimum of $150,000.00.

134.     In light of the foregoing, Vas has suffered, and continues to suffer, damages including, without limitation loss of value, loss of earnings, and reputational harm in an amount to be determined at trial, but a minimum of $4,200,000.00.

**WHEREFORE**, Plaintiff, Srinivas Paruchuri, demands judgment as follows:

1. With respect to the FIRST CAUSE OF ACTION, damages in an amount to be determined at trial, but a minimum of $4,357,235.70, plus consequential damages and attorneys' fees.

2. With respect to the SECOND CAUSE OF ACTION, damages in an amount to be determined at trial, but a minimum of $4,357,235.70.

3. With respect to the THIRD CAUSE OF ACTION, damages in an amount to be determined at trial, but a minimum of $4,200,000.00.

4. With respect to the FOURTH CAUSE OF ACTION, damages in an amount to be determined at trial, but a minimum of $4,200,000.00.

5. With respect to the FIFTH CAUSE OF ACTION, damages in an amount to be determined at trial, but a minimum of $150,000.00.

6. With respect to the SIXTH CAUSE OF ACTION, damages in an amount to be determined at trial, but a minimum of $4,200,000.00.

7. Appropriate interest, the costs and disbursements of this action, and such other and further relief as the court deems just and proper.

Dated: New York, New York
October 25, 2022

MOSS & MOSS LLP

By: _____

BRANDON MCKENZIE
Moss & Moss LLP
381 Park Avenue South
Suite 1220
New York, New York 10016
Tel.: 212 644-1000
Email: bmckenzie@mossandmoss.com

## VERIFICATION

STATE OF CONNECTICUT)
               ) ss.:
COUNTY OF FAIRFIELD  )

       SRINIVAS PARUCHURI, being duly sworn, deposes and says:

       I am the Plaintiff if the within action. I have read the foregoing complaint and know the contents thereof; and the same is true to my own knowledge, except as to those matters stated to be upon information and belief, and as to those matters, I believe them to be true.

                                      SRINIVAS PARUCHURI

Sworn to before me this 25th
Day of October, 2022 by Srinivas Paruchuri

NOTARY PUBLIC

__ Personally Known OR _X_ Produced Identification
Type of Identification Produced _License_

**FRANK SCATURCHIO**
*NOTARY PUBLIC*
**MY COMMISSION EXPIRES FEB. 28, 2026**

# EXHIBIT 1

Delaware.gov                                    Governor | General Assembly | Courts | Elected Officials | State Agencies

---

**Department of State: Division of Corporations**

Allowable Characters

---

**HOME**                                        Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | |
|---|---|---|
| File Number: | **6587508** | Incorporation Date / Formation Date: **2/2/2022** (mm/dd/yyyy) |
| Entity Name: | **RE.IMAGIN, INC.** | |
| Entity Kind: | **Corporation** | Entity Type: **General** |
| Residency: | **Domestic** | State: **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | |
|---|---|---|
| Name: | **THE CORPORATION TRUST COMPANY** | |
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE ST** | |
| City: | **WILMINGTON** | County: **New Castle** |
| State: | **DE** | Postal Code: **19801** |
| Phone: | **302-658-7581** | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[Submit]

[View Search Results]                           [New Entity Search]

---

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

---

# EXHIBIT 2

| Headcount | | FY 2022E | FY 2023E | FY 2024E | FY 2025E | FY 2026E | FY 2027E | Total |
|---|---|---|---|---|---|---|---|---|
| CEO | $ 150,000 | - | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| CTO | $ 150,000 | - | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Head of Product | $ 220,000 | - | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Data Scientist | $ 140,000 | - | 4.0 | 11.0 | 37.0 | 73.0 | 157.0 | 157.0 |
| Customer Success | $ 85,000 | - | 1.0 | 3.0 | 10.0 | 19.0 | 38.0 | 38.0 |
| Support | $ 65,000 | - | 1.0 | 3.0 | 3.0 | 5.0 | 8.0 | 8.0 |
| Sales | $ 65,000 | - | 1.0 | 3.0 | 10.0 | 19.0 | 38.0 | 38.0 |
| Marketing | $ 55,000 | - | 1.0 | 3.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| Technician | $ 85,000 | - | 4.0 | 17.0 | 53.0 | 106.0 | 212.0 | 212.0 |
| Total | | - | 15.0 | 43.0 | 121.0 | 230.0 | 461.0 | 461.0 |

| Inflation increase | 4% | 0 | 1 | 2 | 3 | 4 | 5 | |
|---|---|---|---|---|---|---|---|---|
| CEO | | - | 156,000 | 162,240 | 168,730 | 175,479 | 182,498 | |
| CTO | | - | 156,000 | 162,240 | 168,730 | 175,479 | 182,498 | |
| Head of Product | | - | 228,800 | 237,952 | 237,952 | 237,952 | 237,952 | |
| Customer Success | | - | 88,400 | 275,808 | 919,360 | 1,746,784 | 3,493,568 | |
| Support | | - | 67,600 | 210,912 | 210,912 | 351,520 | 562,432 | |
| Marketing | | - | 57,200 | 178,464 | 297,440 | 297,440 | 297,440 | |

| Implementation Cost Headcount | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Technician | | - | 353,600 | 1,562,912 | 5,067,512 | 10,135,025 | 20,270,049 | |
| Data Scientist | | - | 582,400 | 1,665,664 | 5,602,688 | 11,053,952 | 23,773,568 | |
| Sales | | - | 67,600 | 210,912 | 703,040 | 1,335,776 | 2,671,552 | |

| Implementation Cost | $ - | $ 1,003,600.00 | $ 3,439,488.00 | $ 11,373,240.32 | $ 22,524,752.64 | $ 46,715,169.28 |
|---|---|---|---|---|---|---|

| All Employee Cost | $ - | $ 754,000.00 | $ 1,227,616.00 | $ 2,003,123.20 | $ 2,984,653.57 | $ 4,956,387.87 |
|---|---|---|---|---|---|---|

Don't double count here . In purple are people cost covered by implementation

Case 1:22-cv-10998-VEC    Document 1-1    Filed 12/30/22    Page 28 of 86

# EXHIBIT 3

# Confidentiality and IP Assignment Deed

Prepared for: Srinivas Paruchuri

Date: April 11, 2022

Date: April 11 2022

## Parties

1    Srinivas Paruchuri of 25 Forest Street Apt 7J Stamford CT 06901 (Assignor)

2    **Re.imagin Inc.** of 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19801 (**Company**)

## Background

A    The Assignor has created and developed certain Intellectual Property Rights to be used by Company, and may continue to create and develop Intellectual Property Rights for Company from time to time.

B    Against this background, the Assignor acknowledges that the Company is the sole owner of the Business IP and associated Confidential Information, and has agreed to:

(i)    formalise the assignment of the Business IP and associated Confidential Information to Company; and

(ii)    affirm non-disclosure and undertake not to disclose the Confidential Information on the terms of this deed.

The parties agree

# 1.    Defined terms and interpretation

## 1.1. Definitions

In this deed:

**Company Business** means the business of the Company and its related companies as at the date of this deed as modified from time to time.

**Business Day** means a day on which banks are open for business excluding Saturdays, Sundays and public holidays in the United States.

**Business IP** means all Intellectual Property Rights relating to the Company Business which the Assignor:

1.1.1.    has developed or created;

1.1.2.    has contributed to the development or creation of; or

1.1.3.    will (on and from the date of this deed) create, develop or contribute to the development or creation of,

including without limitation the works listed in Annexure A.

Case 1:22-cv-10998-VEC   Document 1-1   Filed 12/30/22   Page 31 of 86

**Confidential Information** means:

1.1.4.   the Business IP and all associated confidential information related to the Business IP;

1.1.5.   all confidential information related to the Company Business held by the Assignor;

1.1.6.   all confidential information which the Assignor becomes aware of or generates in connection with the Company Business;

1.1.7.   notes and other records prepared by the Assignor based on or incorporating the information referred to in any of paragraphs 1.1.1. to 1.1.5.;

1.1.8.   all information, notes, records and copies of the same referred to in any of paragraphs 1.1.1. to 1.1.5. whether or not in material form and whether disclosed before or after the date of this deed; and including the terms of this deed and all ideas, concepts, research, methodologies, processes, trade secrets, know-how, technical information, marketing information, software, intellectual property or information regarding product, marketing, financial affairs or business methods of the Company, but excluding any information that:

   1.1.8.1.   becomes generally available to the public other than because of a breach of this deed by the Assignor;

   1.1.8.2.   was known to the Assignor on a non-confidential basis before [April 4 2022];

   1.1.8.3.   is obtained from a third party who has no obligation of confidentiality to the Company; or

   1.1.8.4.   is independently developed without breach of this deed.

**Effective Date** means [April 11, 2022].

**Intellectual Property Rights** means all industrial and intellectual property rights of whatever nature throughout the world conferred under statute, common law or equity, whether existing now or at any time in the future, and includes rights in respect of or in connection with inventions (including patents), formulae, databases, business processes and methods, trade marks, service marks, business names, trade names, domain names, designs, Confidential Information, trade secrets and know-how and similar industrial and intellectual property rights, copyright materials whether or not registered or registrable, and includes the right to apply for or renew registration of such rights; and includes any derivative works or other modifications, add-ons, enhancements or improvements to the rights referred to above.

**Moral Rights** means moral rights within the meaning of Part IX of the *Copyright Act 1968* (Cth) and any analogous rights arising under statute that exist, or may come to exist, anywhere in the world.

### 1.2. Interpretation

In this deed the following rules of interpretation apply unless the contrary intention appears:

1.2.1.  headings are for convenience only and do not affect the interpretation of this deed;

1.2.2.  the singular includes the plural and vice versa;

1.2.3.  where a word or phrase is given a meaning, other parts of speech and grammatical forms of that word or phrase have corresponding meanings;

1.2.4.  the words 'such as', 'including', 'particularly' and similar expressions are not used as, nor are intended to be, interpreted as words of limitation;

1.2.5.  a reference to this deed includes all schedules and attachments to it;

1.2.6.  a deed on the part of two or more persons binds them;

1.2.7.  when the day on which something must be done is not a Business Day, that thing must be done on the following Business Day;

1.2.8.  no rule of construction applies to the disadvantage of a party because that party was responsible for the preparation of this deed or any part of it.

## 2.    Assignment and Delivery

### 2.1. Assignment of Business IP

As of the Effective Date, the Assignor hereby assigns to the Company (and the Company accepts assignment of), including by way of present assignment of future rights:

2.1.1.  all of their right, title and interest in and to the Business IP and any associated Confidential Information, free of any encumbrances; and

2.1.2.  all rights, claims, demands, causes of action, rights of action past, present and future that they may have arising out of or under the Business IP and any associated Confidential Information, including the right to sue for and recover and retain the same for the Company's own use and benefit, and the right to prosecute and continue all existing actions and suits for infringement of the Business IP and any associated Confidential Information for the sole use and benefit of the Company.

### 2.2. Acknowledgement

The Assignor acknowledges the Company is the legal owner of the Business IP and associated Confidential Information.

2.3.  Delivery up

The Assignor agrees, at the Company's request, to promptly deliver to the Company any materials in their possession in which the Business IP or any other associated Confidential Information subsists.

2.4.  Further assurances

The Assignor agrees, at the Company's request, to execute all documents and do all things necessary to:

2.4.1.  give full effect to the subject matter of this deed;

2.4.2.  perfect the Company's right, title and interest in and to the Business IP and any associated Confidential Information, including records on any public registers; and

2.4.3.  if necessary, execute further assignment deeds to cover Business IP created in future.

# 3.  Confidentiality

3.1.  **Assignor must keep Confidential Information confidential**

Subject to clause 3.3., the Assignor must:

3.1.1.  keep the Confidential Information confidential and not disclose any of the Confidential Information without the prior written consent of the Company;

3.1.2.  not copy any document that contains Confidential Information or otherwise record or reproduce that Confidential Information in any material form, without the prior written consent of the Company;

3.1.3.  not apply for, or assist any other person, directly or indirectly, to apply for any registered Intellectual Property Rights based on or utilising any part of the Confidential Information;

3.1.4.  not contest or seek to invalidate any registrations for or applications to register Intellectual Property Rights that are based on or that utilise any part of the Confidential Information; and

3.1.5.  not directly or indirectly exploit the Confidential Information in any way for the benefit, profit or advantage of the Assignor or any third party.

3.1.6.  notify the Company and use its best endeavours to prevent or remedy any suspected or actual unauthorised disclosure of the Confidential Information upon becoming aware of that suspected or unauthorised disclosure;

3.1.7.  following a request by the Company, immediately return or destroy all information or records relating to the Confidential Information and certify that no information or records are retained.

Case 1:22-cv-10998-VEC    Document 1-1    Filed 12/30/22    Page 34 of 86

### 3.2. Assignor does not own Confidential Information

The Assignor acknowledges that the Company owns all Confidential Information created by Assignor in relation to the Company Business and this deed does not:

3.2.1.  transfer to it any interest in the Confidential Information; or

3.2.2.  oblige the Company to disclose any Confidential Information to the Assignor.

### 3.3. Disclosure of Confidential Information

If the Assignor is required by law to disclose the Confidential Information to a third party, the Assignor must:

3.3.1.  notify the third party that the Confidential Information is confidential to the Company;

3.3.2.  notify the Company of a requirement to disclose;

3.3.3.  give the Company reasonable opportunity to take any necessary steps to protect the confidentiality of the Confidential Information; and

3.3.4.  discloses no more than the minimum amount of the Confidential Information required to satisfy such law.

## 4.  Moral Rights

4.1.1.  To the extent permitted by law, the Assignor waives any Moral Rights they may have in the Business IP or associated Confidential Information.

4.1.2.  The Assignor hereby irrevocably and unconditionally consents (to the fullest extent permitted by law - either present or future) to the Company doing all acts or omissions, whether occurring before or after the Assignor gives this consent, in relation to the Business IP, where any such acts or omissions would, apart from this consent, infringe the Assignor's Moral Rights subsisting in the Business IP or associated Confidential Information.

## 5.  Warranties

The Assignor represents and warrants that:

5.1.1.  it is the sole author, creator and owner of the Business IP and associated Confidential Information;

5.1.2.  as at the date of this deed, the Assignor has not dealt with the Business IP, its associated Confidential Information, other Confidential Information or any of the rights in same in any manner which is inconsistent with the rights granted or its obligations under this deed;

5.1.3.  the Business IP and associated Confidential Information do not infringe any Intellectual Property Rights or other rights of any third party.

5.1.4.   the Business IP and associated Confidential Information is not subject to other assignment deeds or similar agreements.

## 6.   Duties and taxes

the Company will pay any stamp duty or other taxes payable on this deed, any instruments entered under this deed, or in respect of the subject matter of this deed.

## 7.   General

7.1.1.   This deed takes effect on and from the Effective Date.

7.1.2.   The obligation of the parties under this deed will survive any termination or expiry of this deed or the engagement and continue in perpetuity.

7.1.3.   Each party must pay its own costs and expenses of negotiating, preparing and executing this deed and any other instrument executed under this deed.

7.1.4.   This deed may be executed in counterparts. All executed counterparts constitute one document.

7.1.5.   A term or part of a term of this deed that is illegal or unenforceable may be severed from this deed and the remaining terms of this deed continue in force.

7.1.6.   The Assignor acknowledges that monetary damages alone would not be adequate compensation to the Company for the Assignor's breach of its obligations under this deed and that specific performance of those obligations is an appropriate remedy.

7.1.7.   Except as expressly provided in this deed, the rights of a party under this deed are in addition to and do not exclude or limit any other rights or remedies provided by law.

## Execution page

Executed as a deed.

| | |
|---|---|
| Signed, sealed and delivered by Re.imagin Inc. in accordance with section 127 of the *Corporations Act 2001* (Cth) by: | |
| Signature of director<br><br>*Jennifer Snape* | |
| Name of director (print): Jennifer Snape | |

| | |
|---|---|
| Signed, sealed and delivered by the Assignor in the presence of: | |
| Signature of witness:<br><br>*Jennifer Snape* | Signature of Assignor<br><br>*Srinivas Paruchuri* |
| Name of witness (print): Jennifer Snape | Name of Assignor (print)   Srinivas Paruchuri |

## Schedule 1 - Business IP Details

Software/processes known as:

(a)    Re.imagin impact measurement and management software solution first created on or around March 2020;

(b)    Re.imagin Impact Linked Finance Tools first created on or around March 2020;

(c)    Re.imagin Survey Solutions first created on or around March 2020;

(d)    Re.imagin Board Solutions first created on or around March 2020;

(e)    Re.imagin Scorecard first created on or around March 2020;

including any and all specifications, materials relating to the software and all improvements, modifications, enhancements and adaptations.

Business Names, including unregistered trade names

| | | |
|---|---|---|
| Re.imagin Inc. | 87-4802884 | 02-03-2022 |

Domain Names

| | | | | |
|---|---|---|---|---|
| www.reimag.in | Jennifer Snape | Oct – 2026 | Active | Jennifer Snape |

Trade Secret, Knowhow, Confidential Information

| |
|---|
| re.imagin is the first cloud-based SaaS Platform that empowers enterprises to meet shareholder, stakeholder and regulatory requirements with the highest degrees of trust, transparency, and traceability.    re.imagin embeds sustainability into practices, processes and governance systems. |

Copyright (including software, algorithms)

| | |
|---|---|
| Re.imagin IMM software v.1 | March 2022 |

# EXHIBIT 4

# Confidentiality and IP Assignment Deed

Prepared for: Srinivas Paruchuri

Date: April 11, 2022

Date: April 11 2022

## Parties

1    Srinivas Paruchuri of 25 Forest Street Apt 7J Stamford CT 06901 (Assignor)

2    **Re.imagin Inc.** of 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19801 (**Company**)

## Background

A    The Assignor has created and developed certain Intellectual Property Rights to be used by Company, and may continue to create and develop Intellectual Property Rights for Company from time to time.

B    Against this background, the Assignor acknowledges that the Company is the sole owner of the Business IP and associated Confidential Information, and has agreed to:

(i)    formalise the assignment of the Business IP and associated Confidential Information to Company; and

(ii)    affirm non-disclosure and undertake not to disclose the Confidential Information on the terms of this deed.

The parties agree

# 1.    Defined terms and interpretation

## 1.1.    Definitions

In this deed:

**Company Business** means the business of the Company and its related companies as at the date of this deed as modified from time to time.

**Business Day** means a day on which banks are open for business excluding Saturdays, Sundays and public holidays in the United States.

**Business IP** means all Intellectual Property Rights relating to the Company Business which the Assignor:

1.1.1.    has developed or created;

1.1.2.    has contributed to the development or creation of; or

1.1.3.    will (on and from the date of this deed) create, develop or contribute to the development or creation of,

including without limitation the works listed in Annexure A.

Confidential Information means:

1.1.4.   the Business IP and all associated confidential information related to the Business IP;

1.1.5.   all confidential information related to the Company Business held by the Assignor;

1.1.6.   all confidential information which the Assignor becomes aware of or generates in connection with the Company Business;

1.1.7.   notes and other records prepared by the Assignor based on or incorporating the information referred to in any of paragraphs 1.1.1. to 1.1.5.;

1.1.8.   all information, notes, records and copies of the same referred to in any of paragraphs 1.1.1. to 1.1.5. whether or not in material form and whether disclosed before or after the date of this deed; and including the terms of this deed and all ideas, concepts, research, methodologies, processes, trade secrets, know-how, technical information, marketing information, software, intellectual property or information regarding product, marketing, financial affairs or business methods of the Company, but excluding any information that:

   1.1.8.1.   becomes generally available to the public other than because of a breach of this deed by the Assignor;

   1.1.8.2.   was known to the Assignor on a non-confidential basis before [April 4 2022];

   1.1.8.3.   is obtained from a third party who has no obligation of confidentiality to the Company; or

   1.1.8.4.   is independently developed without breach of this deed.

Effective Date means [April 11, 2022].

Intellectual Property Rights means all industrial and intellectual property rights of whatever nature throughout the world conferred under statute, common law or equity, whether existing now or at any time in the future, and includes rights in respect of or in connection with inventions (including patents), formulae, databases, business processes and methods, trade marks, service marks, business names, trade names, domain names, designs, Confidential Information, trade secrets and know-how and similar industrial and intellectual property rights, copyright materials whether or not registered or registrable, and includes the right to apply for or renew registration of such rights; and includes any derivative works or other modifications, add-ons, enhancements or improvements to the rights referred to above.

Moral Rights means moral rights within the meaning of Part IX of the *Copyright Act 1968* (Cth) and any analogous rights arising under statute that exist, or may come to exist, anywhere in the world.

1.2. Interpretation

In this deed the following rules of interpretation apply unless the contrary intention appears:

1.2.1.    headings are for convenience only and do not affect the interpretation of this deed;

1.2.2.    the singular includes the plural and vice versa;

1.2.3.    where a word or phrase is given a meaning, other parts of speech and grammatical forms of that word or phrase have corresponding meanings;

1.2.4.    the words 'such as', 'including', 'particularly' and similar expressions are not used as, nor are intended to be, interpreted as words of limitation;

1.2.5.    a reference to this deed includes all schedules and attachments to it;

1.2.6.    a deed on the part of two or more persons binds them;

1.2.7.    when the day on which something must be done is not a Business Day, that thing must be done on the following Business Day;

1.2.8.    no rule of construction applies to the disadvantage of a party because that party was responsible for the preparation of this deed or any part of it.

## 2.    Assignment and Delivery

2.1. Assignment of Business IP

As of the Effective Date, the Assignor hereby assigns to the Company (and the Company accepts assignment of), including by way of present assignment of future rights:

2.1.1.    all of their right, title and interest in and to the Business IP and any associated Confidential Information, free of any encumbrances; and

2.1.2.    all rights, claims, demands, causes of action, rights of action past, present and future that they may have arising out of or under the Business IP and any associated Confidential Information, including the right to sue for and recover and retain the same for the Company's own use and benefit, and the right to prosecute and continue all existing actions and suits for infringement of the Business IP and any associated Confidential Information for the sole use and benefit of the Company.

2.2. Acknowledgement

The Assignor acknowledges the Company is the legal owner of the Business IP and associated Confidential Information.

2.3. Delivery up

The Assignor agrees, at the Company's request, to promptly deliver to the Company any materials in their possession in which the Business IP or any other associated Confidential Information subsists.

2.4. Further assurances

The Assignor agrees, at the Company's request, to execute all documents and do all things necessary to:

2.4.1. give full effect to the subject matter of this deed;

2.4.2. perfect the Company's right, title and interest in and to the Business IP and any associated Confidential Information, including records on any public registers; and

2.4.3. if necessary, execute further assignment deeds to cover Business IP created in future.

# 3. Confidentiality

3.1. **Assignor must keep Confidential Information confidential**

Subject to clause 3.3., the Assignor must:

3.1.1. keep the Confidential Information confidential and not disclose any of the Confidential Information without the prior written consent of the Company;

3.1.2. not copy any document that contains Confidential Information or otherwise record or reproduce that Confidential Information in any material form, without the prior written consent of the Company;

3.1.3. not apply for, or assist any other person, directly or indirectly, to apply for any registered Intellectual Property Rights based on or utilising any part of the Confidential Information;

3.1.4. not contest or seek to invalidate any registrations for or applications to register Intellectual Property Rights that are based on or that utilise any part of the Confidential Information; and

3.1.5. not directly or indirectly exploit the Confidential Information in any way for the benefit, profit or advantage of the Assignor or any third party.

3.1.6. notify the Company and use its best endeavours to prevent or remedy any suspected or actual unauthorised disclosure of the Confidential Information upon becoming aware of that suspected or unauthorised disclosure;

3.1.7. following a request by the Company, immediately return or destroy all information or records relating to the Confidential Information and certify that no information or records are retained.

3.2. **Assignor does not own Confidential Information**

The Assignor acknowledges that the Company owns all Confidential Information created by Assignor in relation to the Company Business and this deed does not:

3.2.1.  transfer to it any interest in the Confidential Information; or

3.2.2.  oblige the Company to disclose any Confidential Information to the Assignor.

3.3. **Disclosure of Confidential Information**

If the Assignor is required by law to disclose the Confidential Information to a third party, the Assignor must:

3.3.1.  notify the third party that the Confidential Information is confidential to the Company;

3.3.2.  notify the Company of a requirement to disclose;

3.3.3.  give the Company reasonable opportunity to take any necessary steps to protect the confidentiality of the Confidential Information; and

3.3.4.  discloses no more than the minimum amount of the Confidential Information required to satisfy such law.

## 4.    Moral Rights

4.1.1.  To the extent permitted by law, the Assignor waives any Moral Rights they may have in the Business IP or associated Confidential Information.

4.1.2.  The Assignor hereby irrevocably and unconditionally consents (to the fullest extent permitted by law - either present or future) to the Company doing all acts or omissions, whether occurring before or after the Assignor gives this consent, in relation to the Business IP, where any such acts or omissions would, apart from this consent, infringe the Assignor's Moral Rights subsisting in the Business IP or associated Confidential Information.

## 5.    Warranties

The Assignor represents and warrants that:

5.1.1.  it is the sole author, creator and owner of the Business IP and associated Confidential Information;

5.1.2.  as at the date of this deed, the Assignor has not dealt with the Business IP, its associated Confidential Information, other Confidential Information or any of the rights in same in any manner which is inconsistent with the rights granted or its obligations under this deed;

5.1.3.  the Business IP and associated Confidential Information do not infringe any Intellectual Property Rights or other rights of any third party.

Case 1:22-cv-10998-VEC    Document 1-1    Filed 12/30/22    Page 45 of 86

5.1.4.    the Business IP and associated Confidential Information is not subject to other assignment deeds or similar agreements.

## 6.    Duties and taxes

the Company will pay any stamp duty or other taxes payable on this deed, any instruments entered under this deed, or in respect of the subject matter of this deed.

## 7.    General

7.1.1.    This deed takes effect on and from the Effective Date.

7.1.2.    The obligation of the parties under this deed will survive any termination or expiry of this deed or the engagement and continue in perpetuity.

7.1.3.    Each party must pay its own costs and expenses of negotiating, preparing and executing this deed and any other instrument executed under this deed.

7.1.4.    This deed may be executed in counterparts. All executed counterparts constitute one document.

7.1.5.    A term or part of a term of this deed that is illegal or unenforceable may be severed from this deed and the remaining terms of this deed continue in force.

7.1.6.    The Assignor acknowledges that monetary damages alone would not be adequate compensation to the Company for the Assignor's breach of its obligations under this deed and that specific performance of those obligations is an appropriate remedy.

7.1.7.    Except as expressly provided in this deed, the rights of a party under this deed are in addition to and do not exclude or limit any other rights or remedies provided by law.

## Execution page

Executed as a deed.

| | |
|---|---|
| Signed, sealed and delivered by Re.imagin Inc. in accordance with section 127 of the *Corporations Act 2001* (Cth) by: | |
| Signature of director<br><br>*Jennifer Snape* | |
| Name of director (print): Jennifer Snape | |
| | |

| | |
|---|---|
| Signed, sealed and delivered by the Assignor in the presence of: | |
| Signature of witness:<br><br>*Jennifer Snape* | Signature of Assignor |
| Name of witness (print): Jennifer Snape | Name of Assignor (print) |

## Schedule 1 - Business IP Details

Software/processes known as:

(a)  Re.imagin impact measurement and management software solution first created on or around March 2020;

(b)  Re.imagin Impact Linked Finance Tools first created on or around March 2020;

(c)  Re.imagin Survey Solutions first created on or around March 2020;

(d)  Re.imagin Board Solutions first created on or around March 2020;

(e)  Re.imagin Scorecard first created on or around March 2020;

including any and all specifications, materials relating to the software and all improvements, modifications, enhancements and adaptations.

Business Names, including unregistered trade names

|  |  |  |
|---|---|---|
| Re.imagin Inc. | 87-4802884 | 02-03-2022 |

Domain Names

|  |  |  |  |  |
|---|---|---|---|---|
| www.reimag.in | Jennifer Snape | Oct – 2026 | Active | Jennifer Snape |

Trade Secret, Knowhow, Confidential Information

|  |
|---|
| re.imagin is the first cloud-based SaaS Platform that empowers enterprises to meet shareholder, stakeholder and regulatory requirements with the highest degrees of trust, transparency, and traceability.   re.imagin embeds sustainability into practices, processes and governance systems. |

Copyright (including software, algorithms)

|  |  |
|---|---|
| Re.imagin IMM software v.1 | March 2022 |

# EXHIBIT 5

FILED: NEW YORK COUNTY CLERK 11/10/2022 06:57 PM
NYSCEF DOC. NO. 6

INDEX NO. 654131/2022
RECEIVED NYSCEF: 11/10/2022



Draft - Reimag.in initial Investment Information Inbox ×

**Jennifer Snape** <xxx@xxxx.com>

Sat, Jan 13, 2:13 PM

to me ▾

XXXX,

We are delighted to have you join us as an initial investor in Reimag.in.

The terms are a $12M valuation cap with a 20% discount, and we've authorized a total raise of up to $1M with $500K already committed.

If all looks well, please e-sign the SAFE agreement. Wire instructions are outlined below. If it's possible to send the money by the end of the week, we would appreciate it. If not, please let us know a timeline that works better for you.

Recipient: Reimag.in Inc.

Silicon Valley Bank
Bank ID (routing) #:
Account #:

Thank you,

Jenny & Vas

Looks good to me.      I accept the terms.      Not interested.

# EXHIBIT 6

# reimag.in

Driving transparency
in private markets

June 2022

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

# About us

Reimag.in is the first business intelligence solution for your ESG and Impact needs.



We make ESG measurement and reporting simple, so that investors and operators can focus on management and improvement.

reimag.in

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

FILED: NEW YORK COUNTY CLERK 11/10/2022 06:57 PM
NYSCEF DOC. NO. 7

# Problem

Reporting frameworks have saturated the market yet fit for purpose tools do not exist.

Chaotic & Confusing

Wildly Expensive

Lacking Transparency

>450 ESG reporting frameworks

Manual process prone to human error

Poor Data Quality

No standardized reporting

Highly inefficient; duplication of work

Inexistant communication amongst stakeholders

remag.n

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

# Market

Representing a $10B opportunity today.

**$10B USD**

Asset
Owners

- 6,000 Public Pensions US[8] ($3M)
- 7,300 Family Offices[6] ($2M)

Asset
Managers

- 3,500 Private Equity Funds[4] ($2M)
- 3,000 Venture Capital Funds[5] ($1M)

Companies

- 150,000 Companies*[7] ($3M)

*with more 250 employees*

remagin

4

FILED: NEW YORK COUNTY CLERK 11/10/2022 06:57 PM
NYSCEF DOC. NO. 7

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

## Solution

Reimag.in empowers enterprises and investors to meet **stakeholder, shareholder, and regulatory requirements** with the highest degrees of transparency, traceability, and trust.

REGULATORS    AUDITORS    ASSET OWNERS    ASSET MANAGERS    COMPANIES

One verified source of truth

remag.in

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

# Power of the Platform

Aligning incentives and driving transparency

| ASSET OWNERS | ASSET MANAGERS | COMPANIES |
|---|---|---|
| Pension Fund launches a decarbonization strategy | Private Equity fund sets goal of 20% reduction in emissions during hold period | Company performs first supply chain assessment to baseline emissions |

remagn

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

# Methodology

Our solution is dynamic and actionable.

1  Data Collection & Retrieval

2  Verification & Analytics

3  Integration

> Fully automated integration of data sources

> Verification & audit of performance data

> Automated regulatory reporting

> Framework agnostic approach

> Enhanced decision making through root cause analysis

remagin

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

# Competitive Advantage

## Existing solutions failed to meet expectations

Automated & verified

remagin

Integrated with Board & Mgmt

⊙ Proof of Impact

net purpose

Diligent

▲ ◀ UpMetrics

Tableau

⊘ Metric

impak Finance

Measurement, Reporting

novata

Manual & self-reported

remagin

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

FILED: NEW YORK COUNTY CLERK 11/10/2022 06:57 PM
NYSCEF DOC. NO. 7

# Team



**Jennifer Snape, CEO**

- Founder, Drivers of Impact
- Impact Specialist, Bain Capital
- Founding Team Member, United Nations Development Program SDG Impact
- UN Delegate, IMP Structured Network
- Risk Advisory Financial Services, PwC



**Dr. Vas Paruchuri, CTO**

- CTO, LiftRocket
- Automation Tech Lead, Coverwallet
- Emerging Markets Portfolio Manager, Millennium Management and HSBC Asset Management
- Co-Founder, Magick Data Sciences




re:mag.n

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

FILED: NEW YORK COUNTY CLERK 11/10/2022 06:57 PM
NYSCEF DOC. NO. 7

# Progress to date

**Founder-market fit led to great customer development**

We deeply understand the pain point and know the customer. Talked with 20 VCs and PEs, and identified ideal first customers across AO, AM, enterprise.

**Designed initial product**

Built a prototype to test functionality with users. Began collecting data and building database.

**Launched pilot**

Identified three pilot users who have significant ESG reporting needs. The business case builds to $500K+ ARR. Most brands we met are leaning in, and that funnel is worth ~$20M ARR.

**Raising pre-seed round**

We bootstrapped to this point on $35K, and are now looking for the right institutional partner. The fundraise will support the team that will onboard 10 customers in 12 months. To get to $1M ARR, we need 8 customers.

We're piloting with customers and partners across the globe





9

# Endorsed by leaders in the impact community

Supported by leading standard setters and industry bodies in the impact community



THE
DISTRIBUTION
INITIATIVE

GREENHOUSE
GAS PROTOCOL

**SOCIAL VALUE**
INTERNATIONAL







SDG Impact

GRI

Empowering
Sustainable
Decisions

IMPACT
MANAGEMENT
PROJECT

**VALUE
REPORTING
FOUNDATION**
SASB
STANDARDS


UNIVERSITY OF
OXFORD


UN
DP


DRIVERS
OF IMPACT

remagi.n

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

FILED: NEW YORK COUNTY CLERK 11/10/2022 06:57 PM
NYSCEF DOC. NO. 7

'Business as usual' has evolved.

We make impact management and governance effortless for companies.

# EXHIBIT 7

**From:** Jennifer Snape < >
**Date:** Wednesday, July 27, 2022 at 5:55 PM
**To:** "Harms, Austin M. (SFO)" < >
**Cc:** Vas Paruchuri < >
**Subject:** Re: Introducing Reimag.in

Hi Austin,

Thank you. Yes, to confirm could we structure as the Holding Company and the US Operating Company. I've added some comments in blue below.

Thank you,
Jenny

On Wed, Jul 27, 2022 at 5:53 PM Harms, Austin M. (SFO) < > wrote:

Jenny -- ok, great. To confirm, do you still want to drop a US operating sub now like the diagram shows or is the idea to have Reimag.in be the operating company now and then can be the parent of the UK sub down the road?

Responses to your other questions in red:

- At the time of incorporation, the name was Re.imagin Inc. As you'll see, we have an EIN number and an SVB bank account. How difficult would it be to change the name to Reimag.in Inc? We would like to close our F&F round in the next few weeks. Will it be more complicated to change the name afterwards?

- Current documentation (with Thompson Hine) contemplated an ESOP plan. I don't believe this was executed. We wanted to confirm whether additional hires are typically granted shares or stock options (e.g., we hire a Chief of Staff and would like to award 1% -- is this awarded as shares or stock options?).

- Vas to receive 33%, Jenny to maintain 67%.
- Vas to have a Board seat.

**Austin Harms | Perkins Coie LLP**
ASSOCIATE
D. +1.415.344.7017
E. AHarms@perkinscoie.com
Firm Bio | LinkedIn

# EXHIBIT 8

10/12/22, 12:02 PM Case 1:22-cv-10998-VEC Document 1-PayPal Acti Filed 12/30/22 Page 67 of 86



**Li Jie Ye**
August 1, 2022 . Money Sent

**- $617.70**

## Paid with

Apple Card
(MasterCard Credit Card x-1978)
You'll see "PAYPAL *lijieye2004"
on your card statement.

$617.70

## Transaction ID

1ES50201U80696812

## Contact info

**Message Li Jie Ye**

## Details

Sent to Li Jie Ye                                                    $600.00

Fee                                                                          $17.70

Total                                                                       $617.70

Case 1:22-cv-10998-VEC    Document 1-1    Filed 12/30/22    Page 68 of 86



**Li Jie Ye**
July 24, 2022 . Money Sent

**- $309.00**

## Paid with

Apple Card
(MasterCard Credit Card x-1978)
You'll see "PAYPAL *lijieye2004"
on your card statement.

$309.00

## Transaction ID

45074606F7651552P

## Contact info

**Message Li Jie Ye**

## Details

| | |
|---|---|
| Sent to Li Jie Ye | $300.00 |
| Fee | $9.00 |
| Total | $309.00 |



**Li Jie Ye**                                                    **- $309.00**
July 19, 2022 . Money Sent

## Paid with

Apple Card                                                         $309.00
(MasterCard Credit Card x-1978)
You'll see "PAYPAL *lijieye2004"
on your card statement.

## Transaction ID

1GT52072AV7240613

## Contact info

## Message Li Jie Ye

## Details

Sent to Li Jie Ye                                                  $300.00
Fee                                                                  $9.00

Total                                                              $309.00

# EXHIBIT 9

August 15, 5:38 AM

100%



https://dev.reimag.in/portco-onboard/step1a
Comments:
**Considered DONE**

https://dev.reimag.in/portco-onboard/step1b
Comments:

## Version history

All versions

Total: 1 edit    ‹  ›

**August 15, 5:46 AM**
● Jennifer Snape

**August 15, 5:43 AM**
● Jennifer Snape

**August 15, 5:41 AM**
● Jennifer Snape

▶ **August 15, 5:38 AM**
● Jennifer Snape

▶ **August 12, 5:26 PM**
● Vas Panuchuri

▶ **August 11, 11:37 AM**
● Jennifer Snape
● Vas Panuchuri

**August 11, 10:07 AM**
● Jennifer Snape

**August 10, 11:49 AM**
● Vas Panuchuri

☑ Show changes

# EXHIBIT 10



August 22, 1:45 AM

100%

https://dev.reimag.in/portco-onboard/step1a
Comments:
**Considered DONE**

https://dev.reimag.in/portco-onboard/step1b
Comments:
**Considered DONE**

https://dev.reimag.in/portco-onboard/step2a

Company Registration Number *     Date of Incorporation *

Version history

All versions

Total: 1 edit    ‹    ›

• Jennifer Shape

August 22, 1:56 AM
• Jennifer Shape

August 22, 1:56 AM
• Jennifer Shape

August 22, 1:54 AM
• Jennifer Shape

August 22, 1:52 AM
• Jennifer Shape

August 22, 1:51 AM
• Jennifer Shape

**August 22, 1:45 AM**
• Jennifer Shape

August 22, 1:45 AM
• Jennifer Shape

August 17, 8:15 AM
• Vas Paruchuri

Show changes

# EXHIBIT 11



Version history

All versions

August 28, 4:46 AM
⊥ Shantanu Bahadure

August 28, 4:45 AM
⊥ Shantanu Bahadure

August 28, 4:44 AM
⊥ Shantanu Bahadure

August 28, 4:44 AM
⊥ Shantanu Bahadure

August 28, 4:43 AM
⊥ Shantanu Bahadure

**August 28  3:50 AM**
● Jennifer Snape

August 26, 5:50 AM
● Jennifer Snape

▸ August 22, 2:11 AM
● Jennifer Snape

August 22, 2:10 AM
● Jennifer Snape

August 22, 2:08 AM

Show changes

Edit 1 of 2    ⟨    ⟩

← August 28, 3:50 AM

100% ▾

https://dev.remag.in/portico-onboard/step1a
**Jennifer Snape**
**Considered-DONE**

https://dev.remag.in/portico-onboard/step1b
Comments:

**Considered-DONE**

https://dev.remag.in/portico-onboard/step2a
Comments:

Date of Incorporation '

08/15/2022



August 28, 3:50 AM

100%

https://dev.reimag.in/cortoc-onboard/step1a
Comments:
~~Considered~~-DONE

https://dev.reimag.in/cortoc-onboard/step1b
Comments:
~~Jennifer Snape~~
~~Considered~~-DONE

https://dev.reimag.in/cortoc-onboard/step2a
Comments:

Date of Incorporation '

08/15/2022

Version history

All versions

Edit 2 of 2   <   >

August 28, 4:46 AM
○ Shantanu Bahadure

August 28, 4:45 AM
○ Shantanu Bahadure

August 28, 4:44 AM
○ Shantanu Bahadure

August 28, 4:44 AM
○ Shantanu Bahadure

August 28, 4:43 AM
○ Shantanu Bahadure

August 28, 3:50 AM
● Jennifer Snape

August 26, 5:50 AM
● Jennifer Snape

▾ August 22, 2:11 AM
● Jennifer Snape

August 22, 2:10 AM
● Jennifer Snape

August 22, 2:08 AM

Show changes

# EXHIBIT 12

August 2022

# reimag.in

## Discussion: Q4 '22 – Q2 '23 Workplan

Attendees:
Jennifer Snape
Vas Paruchuri

Allan Snape
Peter Ngunyi

FILED: NEW YORK COUNTY CLERK 11/10/2022 06:57 PM
NYSCEF DOC. NO. 13

remag.n

# Workplan Strategy and Overview

## Agenda

- Proposed Milestones
- KPIs
- Product Roadmap
- Budget for GTM product development
- Team
- Advisors

- Capitalization Strategy (Peter)

## Appendix
- Workstream Detail

# Product Roadmap

For Jan 2023, we would have Diligence, Company and Investor products ready.

reimag.in

2022     2023

4  11  18  25  1  8  15  22  29  5  12  19  26  3  10  17  24  1  7  14  21  28  5  12  19  26

Reimag.in Diligence™
Reimag.in Company™
Onboarding
Dashboard
Modules
Reimag.in Investors™
Onboarding
Company Profile Card
Dashboard
Reimag.in Boards™

Start
Version 1 Complete
Version 2 Complete

INDEX NO. 654311/2022
NYSCEF DOC. NO. 13
RECEIVED NYSCEF: 11/10/2022
FILED: NEW YORK COUNTY CLERK 11/10/2022 06:57 PM

# Milestones

Below outlined goals to achieve before next funding round. Additional KPIs to be outlined in KPI achievement.

| | Owner | 2022 | | | | | | 2023 | | | | Notes |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | |
| **Products** | | | | | | | | | | | | |
| Reimag.in Diligence™ | Vas | | | | | | | | | | | • Jenny to provide schematic and iteration |
| Reimag.in Company™ | Vas | | | | | | | | | | | • Beth / Tatenda to challenge content |
| Reimag.in Investors™ | Vas | | | | | | | | | | | • Shantanu to provide design |
| Reimag.in Boards™ | Vas | | | | | | | | | | | • George to add HCD |
| | | | | | | | | | | | | • Vas to manage build |
| **Comms** | | | | | | | | | | | | |
| Website 2.0 | Jenny | | | | | | | | | | | • JS/PN to manage comm strategy |
| Advisory Board | Jenny | | | | | | | | | | | • JS to outline roles & responsibilities. Formalize group for January |
| Thought Leadership | Jenny | | | | | | | | | | | • JS to publish 4 pieces by Jan |
| Pilot Program | Jenny | | | | | | | | | | | • 3 PE funds on the platform |
| | | | | | | | | | | | | • RA to review partnership |
| | | | | | | | | | | | | • PN to negotiate contract |
| **Fundraising** | | | | | | | | | | | | |
| Budget | | | | | | | | | | | | • 8/31 discussion |
| **Partnerships** | | | | | | | | | | | | |
| Partnerships | Jenny | | | | | | | | | | | • JS / RA / PN to Formalize IWA, UNDP, BIA, BEE (2/4 by Jan) |

reimag.in

FILED: NEW YORK COUNTY CLERK 11/10/2022 06:57 PM
NYSCEF DOC. NO. 13

# Milestones

At a later stage, we will develop KPIs around product traction / margin.

**KPIs**

**Products**

Reimag.in Diligence™
Reimag.in Company™
Reimag.in Investors™
Reimag.in Boards™

- Number of companies
- Number of funds
- Number of asset owners
- Number of login credentials

**Comms**

Website 2.0

- Number of views
- % Conversion (views to booked demo)
- % Conversion (demo to product)

Thought Leadership

- Number of pieces (output)
- Number of views
- Inbound due to research

Pilot Program

- 3 PE funds

**Partnerships**

Partnerships

- Value of partnerships

For discussion.
By November, I would like to
commit to goals for Q1, Q2 2023.

Allan/Peter should challenge these
goals.

**ILLUSTRATIVE**

reimag.in

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

# GTM Product Cost [1/2]

Between now and January, it should cost $150K to bring the three products to market.

| | August | September | October | November | December | Notes / Comments: |
|---|---|---|---|---|---|---|
| Salaries | | | | | | |
| Jenny | | | | | | |
| Vas | | 6,000 | 6,000 | 6,000 | 6,000 | |
| Product Manager | | | 5,000 | 5,000 | 5,000 | |
| Contract | | | | | | |
| Little Planet - Shantanu | 2,000 | 2,500 | 2,500 | 2,500 | 2,500 | |
| Lijie (50%) | 3,200 | 3,200 | | | | |
| George (HCD / UX) | | 2,000 | | | | |
| Ianson | | | 6,000 | 6,000 | 6,000 | |
| Uzair (Website Design v2) | | 2,000 | | | | |
| Kainat (Social Media) | | | 1,200 | 1,200 | 1,200 | |
| Tech 1 | | 4,000 | 4,000 | 4,000 | 4,000 | |
| Tech 2 | | 4,000 | 4,000 | 4,000 | 4,000 | |
| Business 1 | | | | | | |
| Operations 1 | | | | | | |
| Impact Specialist 1 | | 2,500 | 2,500 | 2,500 | 2,500 | |
| Impact Specialist 2 | | 2,500 | 2,500 | 2,500 | 2,500 | |
| Impact Specialist 3 | | 2,500 | 2,500 | 2,500 | 2,500 | |

remag.n

INDEX NO. 654311/2022
RECEIVED NYSCEF: 11/10/2022

# GTM Product Cost [2/2]

Between now and January, it will cost $150K.

| | August | September | October | November | December | Notes / Comments: |
|---|---|---|---|---|---|---|
| Tech Providers | | | | | | |
| Codat | | | | | | |
| Merge | | | | | | |
| AWS | 250 | 250 | 250 | 250 | 500 | 500 |
| Zoom | 0 | 0 | 0 | 0 | 0 | 0 |
| Google | 80 | 80 | 80 | 80 | 80 | 80 |
| Freshbooks | 50 | 50 | 50 | 50 | 50 | 50 |
| GitLab | | 250 | 250 | 250 | 250 | 300 |
| SalesForce | | | | 150 | 300 | |
| PitchBook | | | | | | |
| Business Operations | | | | | | |
| Perkins Coie | | | | | | |
| Marketing/Branding | | | | | | |
| Accounting | | 2,000 | 2,000 | 2,000 | 2,000 | |
| Data Security | | | | | | |
| Underwriting | | | | | | |
| Office Space | | 500 | 500 | 500 | 500 | |
| Miscellaneous | | | | | | |
| Conferences | | | | 2,500 | | |
| Travel | | | | | | |
| Monthly Cash Burn | 5,580 | 22,830 | 31,830 | 39,730 | 32,430 | |

remag.n

Case 1:22-cv-10998-VEC    Document 1-1    Filed 12/30/22    Page 85 of 86



# Staffing against Workstreams

# Advisors

remag.n

## Impact Expertise



Founding Managing Partner of
Mondiale Impact

Chair of Climate Ready
Australia 2030

Member of a World Bank
Steering Group for Innovative
Finance

**ADVISOR**

OECD Social Impact Investing
Initiative

World Economic Forum Ideas to
Practice

## PhD Business/Risk/Audit



Doctorate from the University of
Sydney

MD, Global Risk Institute Think
Tank

Adjunct Professor, Rotman School
of Management @ Univ. of
Toronto)

Vice Chair of the Board of George
Brown College

**ADVISOR**

C-suites, Boards, and the
senior leadership globally

## Software / Tech



All-Party Parliamentary Group on
Artificial Intelligence (APPC AI)

Chief Business Officer, Lifescore

Ambassador, Clinton Foundation

Co Founder, Tandem Bank

Non-executive Director, Tech
start-up in the wellness/ancestry
market

**ADVISOR**

MachineOS

London Irish Business Society

## Advisory and Growth Strategy



Ceo EarlyBird Venture Lab

Founder - Global South Think
Tank

Member and Partner - Haram-
bean Alliance

President -BRICK 2018 Time top
50

**ADVISOR**

Marketforce - YC20/SOSV 21
WorkPay - YC 20
+20 other startups

## Data and Partnerships

XXX

Managing Director -London
Stock exchange Group
accelerator

Managing Director- Thomp-
son Reuters Africa

Fintech women 2020

YPO

**ADVISOR**

Africa Leadership
Foundation
Model Q

**ADVISOR**